UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
GOUR G. BHADURI,                                  :
                                                  :
                      Plaintiff,                  :
                                                  :         05 Civ. 7024 (HB)
       - against -                                :
                                                  :         <u>OPINION & ORDER</u>
SUMMIT SECURITY SERVICES, INC.,                   :
                                                  :
                      Defendant.                  :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

On August 8, 2005, Gour G. Bhaduri ("Bhaduri" or "Plaintiff"), proceeding *pro se*, filed a complaint against his employer, Summit Security Services, Inc. ("Summit" or "Defendant"), that alleged race and national origin discrimination, retaliation, and hostile work environment claims pursuant to Title VII of the Civil Rights Act of 1964, as well as an age discrimination claim pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), as codified, 29 U.S.C. §§ 621-634.  The retaliation claim was dismissed in my Opinion & Order dated August 8, 2006.  <u>Bhaduri v. Summit Sec. Servs.</u>, 2006 WL 2290766 (S.D.N.Y. Aug, 8, 2006).  Defendant then filed a motion for summary judgment.  I found, utilizing the more liberal test allowed to a party that proceeds *pro se*, that issues of material fact remained and relying upon several theories in Title VII jurisprudence, I denied summary judgment.  <u>Bhaduri v. Summit Sec. Servs.</u>, 2006 WL 3114272 (S.D.N.Y. Nov., 2, 2006).  A two and a half day bench trial began on November 17, 2006 with respect to the Plaintiff's claims of hostile work environment and wage disparity based on race, national origin, and age discrimination.  Parties were given until December 10, 2006 to submit post-trial findings of fact and law and summations were held on December 18, 2006.

### I.     FINDINGS OF FACT

Plaintiff was born on March 1, 1927, and was in his late sixties and seventies during the events recounted below.  Plaintiff is an educated Indian male, with a college degree in Economics and Philosophy, but with little ability to make himself understood verbally in English and sought no interpretive assistance.  As a result, I asked him to write out both his opening statement and summation so that the record would be comprehensible at least to that extent.  He also wrote out questions that were posed to some of the witnesses by my deputy clerk.  In addition, the Court

took over some of the discovery for the Plaintiff. Several requests for essential records were produced by the Defendant at my direction.

A. *Bhaduri's Employment History at Summit*

Plaintiff was hired first as a part-time security guard for Summit Security on April 22, 1992. Summit Security, founded in 1976, provides security services in the New York area and has approximately 2,000 employees. Jim Nicchio Declaration ("Nicchio Decl.") ¶ 7. Bhaduri was fired on February 2, 1994, Pl.'s Ex. 38, but re-hired as a full-time security guard on October 7, 1994 as part of a conciliation agreement between him and Summit to resolve an earlier age discrimination complaint Plaintiff filed with the New York State Division of Human Rights ("NYSDHR") in 1993. Pl.'s Ex. 43; See also Nicchio Decl. ¶ 14. As a full-time employee of Summit Security, Bhaduri was eligible to join Allied International Union ("Union"), which he did. Pl.'s Ex. 8.

During Plaintiff's tenure at Summit, he was assigned to various work sites. That chronology follows:

> May 1, 1992 –  875 3rd Ave.  Def.'s Ex. N.
> March 9, 1993 – 145 East 32nd Street (NYU Medical Center).  Pl.'s Ex. 56.
> October 12, 1994 –  254 Canal Street / 110 Lafayette Street.  Pl.'s Ex. 55.
> January 5, 1995 – 1460 Broadway and 41st Street.  Pl.'s Ex. 15.
> July 21, 1995 – 542 West 112th Street (Columbia University).  Pl.'s Ex. 13.
> February 15, 1996 – 21 West Street.  Pl.'s Ex. 14.
> June 4, 1997 to March 2006 – 254 Canal Street/ 110 Lafayette Street.  Pl.'s Ex. 12.

As set forth above, Plaintiff has worked at the 110 Lafayette Street site since 1997. He continues to be employed by Summit at this time but has been out since March 2006 on disability due to a broken ankle.

B. *Harassment / Hostile Work Environment Complaints*

Summit's discrimination and harassment policy, a copy of which is provided to every employee, spells out the complaint procedure to be followed by employees allegedly subject to harassment by a fellow employee. All employees are directed to contact the General Manager immediately with discrimination complaints. Def.'s Ex. L, Summit Security Officer Manual. Although Bhaduri admits that he received and read Summit's workplace policy, he never followed the procedure. Tr. at 135:13-136:15. Plaintiff testified that he complained to a former

Summit supervisor (in or around 1996), Tr. at 137:15-20, but never saw the General Manager as the policy instructs.  While he was unable to explain why this happened, there is, not surprisingly, no record of any complaint by the Plaintiff until 2001.  Tr. at 139:11-12. Then the record reveals a single written complaint wherein Bhaduri alleged that a fellow guard, Efrain Hidalgo, yelled at and physically threatened him.  Pl.'s ex. 33; Def.'s ex. LL.  Summit's Human Resources Manager, Angelica Rosello ("Rosello"), testified that after a review of Bhaduri's employment file, she found no other written complaints during his more than ten years at the company.  In fact, during her five years as Human Resources Manager at Summit, she never spoke to, nor met, the Plaintiff.

> The Witness:  The only thing I can say is that he never came to me. I was not aware of any of his complaints, except for the one that I read in this file, but that was in 2001 when I was not the HR manager.  But in any case, anyone made a complaint against any of the supervisors or any guards had any grievances, I was the person who did respond to them and I did investigate any complaints that any security officer had.

Tr. at 273:21-274:3.  In addition, Joseph McGlennan ("McGlennan"), Secretary Treasurer of the Union, who was produced pursuant to a court subpoena, testified that over the past five years, he had received two or three complaints from Bhaduri with respect to harassment by his co-workers and to his knowledge, they were resolved.  Tr. at 245:10-246:10.  McGlennan made it clear that none of the grievances Plaintiff shared with him had to do with race or age discrimination.  Tr. at 248:10-13.

      Bhaduri presents a litany of harassing conduct he was subjected to by Summit employees.  With the exception of the October 2001 incident for which Bhaduri submitted a written complaint to Summit authorities (that resulted in the removal of his co-worker from the site), all of the alleged incidents of harassment are uncorroborated, not to mention unconnected to his age, race, and national origin complaint.  Rather, the record provides credible testimony from several witnesses that they never witnessed or participated in harassment of the Plaintiff.

      Bhaduri claims that he was given an unduly burdensome workload.  For example, Bhaduri reports that he alone was forced to work extra hours to cover the shifts of guards that either were permitted to leave early or slept during their shifts.  Not only is this against Summit policy but the Plaintiff's contention was contradicted by each witness that took the stand.  For example, Summit field supervisor, Evencio Hernandez, testified that he would notify Summit if he saw any on duty guard asleep or leaving the post prior to the end of a shift.  Tr. at 49:20-23.  And Rafael Ortiz,

Director of Property Management of CHH Realty, the company that owns and manages the 110 Lafayette Street property, testified that a company policy was in place whereby guards called in on the hour. To Ortiz's knowledge, no guard had failed to comply with this policy and even after an internal investigation, he found no evidence to support Bhaduri's claims. Tr. at 84:3-85:8.

Bhaduri also claims that he was forced to pick up newspapers and sweep the sidewalk in front of the 110 Lafayette Street site. While it was agreed that these activities were beyond the scope of the job, there was no evidence that Bhaduri was directed to engage in these activities. In fact, it appears that Bhaduri performed these activities of his own accord. Hernandez, a Summit field supervisor, testified to that effect.

> He [Bhaduri] used to sweep outside in the street and I asked him why, he said he didn't want the building to get any ticket because the super wasn't doing his job. I said, well, he wants to do it, I can't tell him, force him not to do it, but I was wondering why he would sweep outside.

Tr. at 61:2-7.

Bhaduri complains that he was taunted by his co-workers. A sampling of these incidents in substance were as follows:

- Hernandez accused him of taking drugs while on the job and having liaisons with prostitutes.

- Stelton Siplis, a fellow security guard, told him he would have to lick the feet of the client to get any wage increase.

Unsurprisingly, these allegations were denied by Hernandez and Siplis, tr. at 63:23-25; tr. at 115:11-22, but more importantly, there was no evidence submitted to support Bhaduri's allegations. Furthermore, I found the witnesses produced by Summit credible. None of them voiced or appeared to bear any animus towards the Plaintiff nor have a motive to lie. Indeed, all agreed that the Plaintiff was a good worker and did his job well.

*C. Summit Security's Pay Structure*

Jim Nicchio, Regional Manager at Summit, testified that hourly wages are governed by the billing rates that prevail at the work site in conjunction with the Collective Bargaining Agreement between Summit and the Union. Nicchio Decl. ¶ 20. Over the past 17 years, the Union has bargained for two raises for a total of $.40. Tr. at 239:16-19.[1]

According to Nicchio, Plaintiff's current work site, 110 Lafayette Street, is one of Summit's lowest paying work sites. The original contract, executed on or about December 13,

---

[1] The Court was informed by Defense counsel that wages were stagnant for some time due to 9/11.

4

1991, provided Summit with an hourly wage rate of $9.00 per hour.  Id. ¶ 32.  Wages for the security guards are subtracted from this amount.  Over the years, the billing rate has increased to $11.10 per hour, the rate at the site currently.  Id.; Def.'s Ex. FF.  At this rate, guards receive $7.25 per hour.  Nicchio Decl. ¶ 32.  Employee pay records support the depressing fact that Bhaduri earned $7.25 per hour before leaving on disability and that this made him the highest paid worker at the 110 Lafayette Street work site.  Court Ex. C.[2]

Since employee wages are location-based, in order for Summit guards to receive more money, they must either 1) request transfer to another work site that pays a higher wage, or 2) the Union must negotiate a higher wage for its members.  Id. ¶ 24.  Field supervisors also have the discretion to recommend individuals for a raise, but a supervisor's recommendation does not guarantee that an employee will receive more money.  While Bhaduri was a good worker, no field supervisor recommended him for a raise.

Since wage rate is determined by the contract between Summit and the landlord at the site, the only way to be sure of a higher wage is to request a transfer to a site where the landlord pays Summit more money for its service and Summit, in turn, pays its employees more money.  Bhaduri never requested a transfer to a higher paying site.  According to Rosello, Summit's Human Resources Manager, employees must submit a transfer request in writing to Summit's Human Resources office.  She testified as follows.

> Q: When a guard requests a transfer to a different location, can you describe the process, what happens, if anything?
>
> A: If a security officer is requesting for [sic] a transfer, usually we tell them to come into the office, write down their name and information, what they are requesting and why they are requesting a transfer.  Most of the time[], if they want to request a transfer we will make sure we have them write it out so we can try and assist them as soon as possible.

Tr. at 285:23 – 286:7.  Rosello confirmed that there was no transfer request in Plaintiff's file.  Tr. at 282:24-283:1 ("I reviewed his whole file and to my recollection I don't have anything in there or anything in writing from him stating that he wants a transfer.").

---

[2] Over the past five years, Plaintiff has received the following wages at the 110 Lafayette site:
  Dec. 2001 - Apr. 2004:  $6.75
  Apr. 2004 -  Apr. 2005:  $6.90
  Apr. 2005 - Dec. 2005:  $7.05
Pl.'s Ex. 57.

Bhaduri maintains that he was not aware that he could transfer between work sites for more money (at least after 1994), tr. at 144:15-19, and contends that even if he had requested and received a transfer, discrimination on the part of Summit would have prevented him from earning a higher wage. Tr. at 144:20-22. Unfortunately for Plaintiff, the weight of the evidence is to the contrary.

Bhaduri's assertion that he had no knowledge of the transfer process seems incredible in light of the fact that upon hire in 1994, Bhaduri signed a statement that acknowledged that his pay rate was determined by location. The statement provided as follows:

> 1. I, Gour Bhaduri, fully understand that my present hourly rate of pay is determined by the location to which I have been assigned.
>
> 2. I also fully understand that my present assignment can be changed due to any Operational Requirement, Account Closure, Disciplinary Action, Client Request, or other circumstances.
>
> 3. I also fully understand that my current hourly rate of pay can be changed to the hourly rate which prevails at the new location of assignment.

Def.'s Ex. D. Further, McGlennan, Secretary Treasurer of Allied International Union, told Bhaduri personally that he could transfer to another site if he wanted more money.

> Q: And in your experience in dealing with Summit, if a guard is unhappy with the pay rate at a specific site, what do you recommend to the guard to do?
>
> A: Recommend them to contact Summit and to look for a transfer to a higher paying site.
>
> . . .
> The Court: Did you ever do that in connection with Mr. Bhaduri?
>
> The Witness: I had asked him if he would like – yes, I did.

Tr. at 256:6-22. Bhaduri responded that he liked where he was. Tr. at 256:23-25.

In sum, the testimony supports the proposition that each employee was aware that their salary was tied to their work site and they did (or would) receive more money upon transfer to higher-paying sites. The Plaintiff himself witnessed this principle at work. Before his permanent posting to the 110 Lafayette and 254 Canal Street sites in 1997, his hourly wages changed (and oftentimes increased) when he was transferred between sites. See, e.g., Def.'s Ex. V (Plaintiff's wage increased from $6.25 to $6.50 upon his transfer from Columbia University to 21 West St).

*D. Discrimination Complaints Filed*

Plaintiff first filed a complaint with the NYSDHR in February 1993 that alleged he was denied a full-time work schedule by Summit due to his age. Pl.'s Ex. 4. As a result of this complaint, on or about October 3, 1994, Summit entered into an agreement with the Plaintiff whereby they agreed, among other things, to reinstate Bhaduri as a full-time employee, retroactive to the start of his employment on April 22, 1992.

On February 28, 2005, Bhaduri filed a second discrimination complaint, the one at bar, with the Equal Employment Opportunity Commission ("EEOC") that alleged harassment by Summit since the filling of his 1993 age discrimination complaint as well as less pay on account of his race, national origin, and in retaliation for his former NYSDHR age discrimination complaint. Pl.'s Ex. 16. After an investigation, the EEOC failed to conclude that Summit violated either Title VII or ADEA and issued a right to sue letter on May 16, 2005. The Complaint currently before this Court was filed on August 8, 2005 and stems from Plaintiff's earlier complaint to the NYSDHR.

## II.    CONCLUSIONS OF LAW

*A. Hostile Work Environment*

Bhaduri alleges that the harassment began in 1993, following his first age discrimination complaint to the NYSDHR, and continues to this day. In order for his claim in the case at bar to be timely under Title VII, the discrimination charge must be filed within 180 days of the alleged illegal employment action, here, August 14, 2004. See 42 U.S.C. § 2000e-5(e)(1). This timeframe serves as a statute of limitations for Title VII cases. See, e.g., Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996).

In the situation where the plaintiff can demonstrate an ongoing policy of discrimination, he/she may rely on a continuing violation theory. In short, that theory provides that if the charge of discrimination "is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims or acts of discrimination under that policy will be timely even if they would be untimely standing alone." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993). While that theory gave me sufficient pause to deny summary judgment until more fully fleshed out at trial, Plaintiff has failed to meet his burden to demonstrate that at least one incident of harassment occurred within the 180 days prior to the filing of a charge with the appropriate agency. Without this, the claim is time-barred.

Plaintiff makes several allegations of harassment that occurred within the timeframe, most recently this year.  However, at trial, the only incident with any evidentiary support stems from October 2001, when he was physically threatened by fellow guard, Ephrain Hidalgo.  Save for this incident, which was memorialized in writing by both parties (and culminated in Summit's removal of Hidalgo from the worksite), there are no other substantiated claims of harassment.  Indeed, the weight of the evidence suggests that there were no such incidents.  Unfortunately for Plaintiff, this single occurrence falls outside of the 180 day statute of limitations.

Furthermore, Plaintiff brings his claim only against Summit, but has failed to demonstrate a basis to hold Summit vicariously liable for its employees' conduct, alleged to have created the hostile work environment. See, e.g., Kotcher v. Rosa & Sullivan Appliance Center Inc., 957 F.2d 59, 63 (2d Cir. 1992).  Employer vicarious liability for a Title VII hostile work environment violation may be established if the individual responsible for the harassing conduct was (or is) the plaintiff's supervisor, with immediate authority over the employee. Mack v. Otis Elevator Co., 326 F.3d 116, 125 (2d Cir. 2003).  Plaintiff provides no evidence that supports his claims of harassment by his supervisors.

But even assuming, *arguendo*, that Bhaduri could overcome these hurdles (e.g. the timeliness of his claim and Summit's liability for the harassing conduct of its employees), he cannot meet the *prima facie* case standard.  To do so, the plaintiff must demonstrate that his work environment is abusive, Harris v. Forklift, 510 U.S. 17, 22 (1973), and show that he is 1) a member of a protected class, 2) suffered unwelcome harassment, 3) the harassment stems from his membership in a protected class, and 4) the harassment is sufficiently severe or pervasive to alter conditions of his employment and create an abusive work environment. Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 65 (1986).  The court looks at the totality of the circumstances to determine harassment – the frequency and severity of the conduct, whether the conduct was physically threatening or humiliating, and whether the behavior interferes with an employee's work performance. Harris, 510 U.S. at 23.  The evidence presented by the Plaintiff, to the extent it exists, does not satisfy this standard. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal quotation marks omitted) (stating that plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment.").

Finally, while it appears Plaintiff was on occasion not respected to an appropriate degree, he

has utterly failed to connect any alleged harassment to his race, national origin, and/or age. For the reasons above, Bhaduri's hostile work environment claim must fail.

*B. Wage Disparity Claim Due to Plaintiff's Race, National Origin, and Age Discrimination*

Plaintiff brings a wage disparity claim against Summit pursuant to Title VII and ADEA that alleges that due to his race, national origin, and age he received less money per hour as compared with non-Indian employees who had less experience than he did. In the summary judgment motion, Defendant argued that this Court lacks subject matter jurisdiction over the age discrimination claim because it was not checked off as a basis of discrimination in the Plaintiff's EEOC complaint filed in 2005. Relying on Butts v. City of New York Department of Housing and Presbyterian and Development and its progeny, I rejected that argument since I found that his age complaints were "reasonably related" to the wage disparity and harassment claims set forth in the complaint.[3] See Bhaduri, 2006 WL 3114272. Put another way, Plaintiff's allegations in the EEOC complaint were sufficient to put the EEOC investigator on notice as to Plaintiff's age discrimination claim. Williams v. New York City Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006) (stating that "the central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'"). This was enough to provide subject matter jurisdiction over the age discrimination claim.

The elements to prove a *prima facie* case are the same for both Title VII and ADEA and the burden-shifting framework of McDonnell Douglas Corp. v Green, 411 U.S. 792 (1973), applies. The plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discriminatory intent. See, e.g., Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004). Thereafter, the burden of going forward shifts to the employer to "articulate some legitimate, non-discriminatory reason for the employer's rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer is able to do so, then plaintiff must show that the stated reason is pretextual. Id.

It is undisputed that Plaintiff, a 79 year-old male of Indian descent, meets the first two

---

[3] This Circuit has held that claims may be reasonably related to the allegations in an EEOC complaint when 1) the complained of conduct would fall within the scope of an EEOC investigation into the charge, 2) a retaliation claim was brought for filing the EEOC charge, and/or 3) the plaintiff alleges additional incidents of discrimination carried out in the same manner alleged in the EEOC charge. Butts, 990 F.2d at 1402-03.

prongs of the *prima facie* case. However, there is no evidence that he suffered an adverse employment action and there is no proof of a causal relationship between any adverse employment action (if there was one and there wasn't) and the employer's discriminatory animus.

An adverse employment action is defined as a materially adverse change in the terms and conditions of an individual's employment that may include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to the particular situation." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal citation omitted). There is no evidence of an adverse employment action here.

Although on disability leave, Plaintiff is still employed by Summit Security. And all the evidence in the record, unrebutted by the Plaintiff, indicates that he was the highest paid worker at the 110 Lafayette work site. Court Ex. C. While true that some of his co-workers did at times receive more money than he did, this only occurred while they were assigned to higher paying sites.

Further, the claim that Bhaduri, who is college-educated, was unaware of the transfer option stretches credulity. His fellow employees at 110 Lafayette Street had worked at higher paying sites and the sworn testimony of McGlennan, the Union's Secretary Treasurer, confirms the fact that Bhaduri was told to request a transfer to another work site if he was unsatisfied with the wages at 110 Lafayette Street. Plaintiff does not argue or suggest otherwise, thus, he has failed to shoulder his burden of proof on his Title VII and ADEA claims.

### III. CONCLUSION

For the reasons above, the complaint is dismissed with prejudice. The Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**

**New York, New York**
**January 17, 2007**

_____
U.S.D.J.

10